805 F.2d 342
 Fed. Sec. L. Rep. P 92,985
WINDON THIRD OIL AND GAS DRILLING PARTNERSHIP, et al.,
Plaintiffs-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, et al., Defendants,
Peat, Marwick, Mitchell & Co. and A. Marshall Snipes,
Defendants-Appellees.
 No. 85-2211.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 10, 1986.
 
 Steven M. Steingard (Mitchell A. Kramer, with him on the briefs), Philadelphia, Pa., for plaintiffs-appellants.
 William E. Hegarty of Cahill Gordon & Reindel, New York City (J. William Conger of Hartzog Conger & Cason, Oklahoma City, Okl., Earl D. Mills of Mills Whitten Mills & Mills, Oklahoma City, Okl., and Victor M. Earle, III, and Edwin D. Scott, of Peat, Marwick, Mitchell & Co., of counsel, New York City, with him on the brief), for defendants-appellees.
 Before McKAY and MOORE, Circuit Judges, and BROWN, District Judge.*
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 In this appeal from a judgment entered pursuant to Fed.R.Civ.P. 54(b), we are asked to consider whether the district court properly granted the motion for summary judgment, foreclosing plaintiffs' federal securities and pendent state fraud claims from trial on the merits. In light of the Supreme Court's recent decisions in Celotex Corporation v. Catrett, --- U.S. ----, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), we have reviewed the record, exhibits, and briefs and conclude no factual dispute cognizable within federal securities law is present to permit plaintiffs' proceeding to trial on this issue. We therefore affirm the order of the district court.
 
 I.
 
 2
 This litigation surfaced in the aftermath of the insolvency of Penn Square Bank (Penn Square) in Oklahoma City, Oklahoma. Windon Third Oil and Gas Drilling Partnership, Windon Fourth Oil and Gas Drilling Partnership, and Windon Fifth Oil and Gas Drilling Partnership (Windon collectively or plaintiffs/appellants) are Pennsylvania limited partnerships which were formed to acquire fractional interests in oil and gas leases for wells in Oklahoma, Kansas, and Texas. Windon retained Clifford Resources, Inc. (C.R.I.), whose president, Hal Clifford, had previously supervised the exploration, development, and operation of Windon partnership wells.[1] Pursuant to the terms of the partnership plans, the partnership entities executed agreements with Penn Square in which individual limited partners borrowed the capital to purchase an interest in a unit of the limited partnership. Each loan agreement apparently contained an interest reserve clause earmarking 20% of the principal of each note for payment of interest due. When Penn Square was declared insolvent, the Federal Deposit Insurance Corporation (FDIC) and Deposit Insurance National Bank (DINB),[2] appointed receivers of the failed bank, took over the notes and declared them in default for nonpayment of interest allegedly in disregard of the terms of the original loan agreements.
 
 
 3
 Consequently, Windon[3] and approximately sixty-five individual limited partners[4] filed a complaint alleging breach of contract, common law fraud, and violations of federal securities laws in the United States District Court for the Western District of Oklahoma against the FDIC; DINB; three officers of Penn Square, Bill Patterson, Bill P. Jennings, and Eldon L. Beller; Peat, Marwick, Mitchell & Co. (P.M.M. or appellee), an accounting firm that audited the books and records of Penn Square and C.R.I.; and A. Marshall Snipes (appellee), an accountant employed by P.M.M. This appeal concerns only the dismissal of Windon's Counts V and VI for common law fraud and federal securities violations respectively upon summary judgment entered in favor of Mr. Snipes and P.M.M.
 
 
 4
 In an amended complaint,[5] Windon alleged a violation of 15 U.S.C. Sec. 78j(b) and Rule 10b-5, stating that on October 8, 1979, Robert P. Olson, Windon's representative and general partner, telephoned Mr. Snipes, then a manager of P.M.M., allegedly seeking due diligence information in anticipation of the formation of the Windon partnerships. Responding to Mr. Olson's questions, Mr. Snipes allegedly represented that he and ten other P.M.M. partners invested exclusively with C.R.I.; C.R.I.'s oil reserves were worth several million dollars; C.R.I.'s cash flow was approximately $45,000 a month from its reserves; and P.M.M. partners had invested some $250,000 with C.R.I. personally. Windon alleged Mr. Snipes knew that Mr. Olson was conducting due diligence in the formation of the limited partnerships and that Mr. Olson would rely on his statements. Windon alleged Mr. Snipes failed to disclose that he and several P.M.M. partners had personally obtained loans from Penn Square with the assistance of C.R.I.; that P.M.M. gained additional fees for rendering accounting services to Penn Square; and that P.M.M. partners did not invest exclusively with C.R.I. Windon averred that it discovered the alleged securities violations when Penn Square was declared insolvent. As a consequence of appellee's alleged misrepresentations and nondisclosures, Windon complained it paid more for the investment and sought for its remedy the difference between the cost paid and the actual value of the investment when made or, alternatively, the cost of the investment.
 
 
 5
 Mr. Snipes and P.M.M. again moved for summary judgment, contending plaintiffs had failed to allege facts to satisfy the elements of a Rule 10b-5 claim; and, absent federal jurisdiction, they further sought dismissal of the state claim for lack of subject matter jurisdiction. Appellees resubmitted Mr. Snipes' original affidavit which averred he received a personal call from a man whose name he did not remember and generally denied he had made each of the representations Windon attributed to him. Windon resisted the motion, countering with Mr. Olson's second affidavit, exhibits, a newspaper clipping, and responses to interrogatories.
 
 
 6
 In granting summary judgment in favor of P.M.M. and Mr. Snipes, the court characterized Mr. Snipes' statements and opinions as "at most tangential" to Windon's investment decision and ultimately too remote from the subject oil and gas investments to be material within the meaning of Rule 10b-5 as set forth in Zobrist v. Coal-X, Inc., 708 F.2d 1511 (10th Cir.1983). Nor, in the court's assessment, did Windon demonstrate justifiable reliance in light of the remoteness of the statements and the disclaimers and caveats in the Windon Third investment memorandum. The court found no fiduciary relationship existed between Messrs. Snipes and Olson to permit an inference of reliance or, alternatively, to support a separate element of a 10b-5 claim. The underlying claim thus negated, the court rejected as insufficient Windon's factual allegations of Mr. Snipes' and P.M.M.'s knowing participation with Penn Square to support Windon's claim for aiding and abetting liability. With no independent basis for federal jurisdiction, the court then dismissed Windon's state law claim.
 
 II.
 
 7
 In this appeal, Windon urges the district court erred in mischaracterizing this case, focusing only on the misrepresentation rather than on the nondisclosures. Windon contends the court's inability to find material misrepresentations in the offering memorandum underscores the essential nondisclosure of C.R.I.'s financial condition of which it now complains. Windon insists Mr. Snipes' alleged nondisclosures and misrepresentations are material in painting a picture of a financially stable C.R.I. This misrepresentation, Windon alleges, led to the selection of C.R.I. as operator, which, in practical terms, becomes the key to a successful drilling program. In support of its position, Windon cites Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), which held that in "failure to disclose" cases, positive proof of reliance is not a prerequisite to recovery. Id. at 153. Appellant asks us to apply the proper standard for summary judgment in securities cases, particularly in the light of the wholly contradictory affidavits and evidence of business interlocks between Penn Square, C.R.I., Mr. Snipes, and P.M.M.
 
 
 8
 In response, appellees contend summary judgment appropriately disposed of Windon's claim of "omissions of immaterial facts ... on an attenuated causal theory against peripheral actors who were not even bystanders to a securities transaction." Although facts may have been disputed, appellees contend no legal significance attaches to those facts under Rule 10b-5.
 
 
 9
 While the debate over summary judgment continues,[6] the Supreme Court has recently addressed the issues of the movant's burden in summary judgment in Celotex Corp. v. Catrett, --- U.S. ----, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and the applicable standard of proof in Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Our review is guided by these discussions. In Celotex, the Court clarified that interpretation of Rule 56(c) in Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), which placed the burden on "the moving party ... to show initially the absence of a genuine issue concerning any material fact." Id. at 159, 90 S.Ct. at 1609. The Third Circuit had construed this language to require the moving party to "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex, 106 S.Ct. at 2533. Reversing the court of appeals, the Court concluded, "We do not think the Adickes language ... should be construed to mean that the burden is on the party moving for summary judgment to produce evidence of the absence of a genuine issue of material fact, even with regard to an issue on which the nonmoving party bears the burden of proof." Id. at 2554. Instead, the movant's burden under Rule 56 is circumscribed by an initial showing of the absence of evidence to support the nonmoving party's case. Id. The movant must identify those portions of "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any" to demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c).[7] Celotex requires no more. The moving party's burden cannot be enhanced to require his proof of a negative; that is, not only is there no evidence in the record, but plaintiff's evidence need not be disproved.
 
 
 10
 Anderson v. Liberty Lobby, Inc., 106 S.Ct. at 2505, addressed the issue of the quantum of evidence necessary to withstand summary judgment in an action for libel. To make this determination, a trial court must look to the substantive law in order to identify which facts are relevant "since materiality is only a criterion for evaluating the evidentiary underpinnings of those disputes." Id. at 2510. Since the evidence of the nonmoving party is deemed true and all reasonable inferences are drawn in his favor, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor." Id. at 2514. Further, determinations of credibility, weighing the evidence, and the drawing of legitimate inferences from the facts remain in the preserve of the jury. Thus, when the finder of fact decides a motion for summary judgment based on the lack of proof of a material fact, the judge must ask, reasoned the Anderson court, whether a "fair-minded jury" could return a verdict for the plaintiff on the evidence presented.
 
 
 11
 We, thus, premise our review of the district court's granting summary judgment on this rubric. Windon's factual allegations must be scrutinized to determine whether inferences deriving from and cognizable within securities law are permissible.
 
 III.
 
 12
 Section 10(b) of the 1934 Exchange Act, 15 U.S.C. Sec. 78j(b), prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." The SEC promulgated Rule 10b-5 which provides in part:
 
 
 13
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 14
 ....
 
 
 15
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....
 
 
 16
 17 C.F.R. Sec. 240.10b-5(b) (1986). These provisions must be read flexibly, not technically and restrictively. Superintendent of Insurance of State of New York v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971).
 
 
 17
 When we apply the facts as alleged to the Rule, we recognize appellees initially have the burden to establish there is no genuine issue concerning a material fact to permit summary judgment as a matter of law. A genuine issue "must be predicated on a viable legal theory." Spectrum Financial Companies v. Marconsult, Inc., 608 F.2d 377, 380 (9th Cir.1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980) (citation omitted). Mr. Snipes and P.M.M. must show, taking all of Windon's allegations as true and resolving all inferences in Windon's favor, that Windon has failed to provide any evidence to establish an essential element of Rule 10b-5. Appellees need not disprove Windon's claim but only establish that the factual allegations have no legal significance and, thus, fail to satisfy the statutory requisites.
 
 
 18
 Windon alleged that Mr. Snipes and P.M.M. failed to disclose material information and misrepresented information about C.R.I.'s financial stability before the creation of the limited partnerships that would have affected the amount a limited partner paid for his investment. For example, Windon alleged that Mr. Snipes had completed an audit of C.R.I. prior to his conversation with Mr. Olson. The audit found in C.R.I.'s file revealed a cash flow deficit in contrast to Mr. Snipes' alleged statement about a positive cash flow. Since we take these allegations as true, we next must determine how they establish an element of the substantive terrain of Rule 10b-5. In other words, to have legal significance, the allegation must be material, made in connection with the purchase or sale of a security, and be one on which Windon reasonably relied.
 
 
 19
 The failure to disclose material information is actionable only "when [one] is under a duty to do so. And the duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." Chiarella v. United States, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (citation omitted). A duty arises from the relationship between the parties not merely because one party has an ability to acquire information. Id. at 231, n. 14, 100 S.Ct. at 1116, n. 14. Without a duty to disclose, silence cannot be made fraudulent.
 
 
 20
 Consequently, for Windon to premise liability on Mr. Snipes and P.M.M. for their alleged failure to disclose, Windon must provide facts which demonstrate that a relationship of trust and confidence existed between the parties. That relationship may be preexisting (allegations of prior dealings) or arise upon the facts and circumstances of the information communicated (allegations that an agency or other fiduciary relationship was created). These allegations would permit an inference that Mr. Snipes had a duty to disclose fully to Mr. Olson. Absent these assertions, the substantive body of securities law must limit the range of permissible inferences we may entertain to decide Windon has met its initial burden of persuasion.
 
 
 21
 Although Chiarella involved the issue of insider liability, the Court there unequivocally rejected the proposition that all participants in market transactions are under a general duty to disclose material, nonpublic information. "Formulation of such a broad duty ... departs radically from the established doctrine that duty arises from a specific relationship between two parties...." Windon fails to allege any relationship, and the record raises no inference of a relationship between Mr. Olson and Mr. Snipes which would provide a basis for a conclusion that Mr. Olson reasonably relied on his conversation with Mr. Snipes. To insinuate more into the Snipes-Olson communication would transform Rule 10b-5 into a general liability statute. The Congressional history belies this reading. See Chiarella, 445 U.S. at 226, 100 S.Ct. at 1113.
 
 
 22
 The alleged misrepresentations or omissions of Mr. Snipes acting on behalf of P.M.M. become remote and tangential in light of the nonexistence of a relationship. While we may indulge inferences in Windon's favor that Mr. Snipes' alleged interlocking business with C.R.I. influenced his communication with Mr. Olson,[8] we cannot accept Windon's theory that once Mr. Snipes voluntarily communicated information to Mr. Olson, Mr. Snipes was under a duty to provide additional information. The absence of this key factual allegation is fatal to establishing the legal element of justifiable reliance.
 
 
 23
 Rule 56 must be applied not only to assure a party asserting claims and defenses adequately based in fact that those claims and defenses will be tried to a jury, but also to assure those opposing such claims and defenses that they will be spared undue litigation when no triable issue exists. Celotex, 106 S.Ct. at 2555. We therefore affirm the order of the district court and remand the action for adjudication of Windon's remaining claims not disposed of by the district court's order of May 19, 1986.
 
 
 
 *
 Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 According to the Confidential Memorandum offering Windon, the general partners of Windon, Robert P. Olson and James A. Weiss, were also general partners of Windon First and Windon Second Oil and Gas Drilling Partnerships, whose oil and gas interests were also operated by C.R.I. [R. II, at 353]
 
 
 [2]
 The DINB is a new bank created to assume and distribute Penn Square's insured deposits
 
 
 [3]
 Originally, Windon 81A Oil and Gas Drilling Partnership joined in the complaint. On June 2, 1981, Windon 81A dismissed all of its claims, leaving the three limited partnerships and most of their individual limited partners in the action
 
 
 [4]
 For clarity, the individual limited partners are included in the collective "Windon" designation
 
 
 [5]
 In its order of March 1, 1984, in response to appellees' first motion for summary judgment, the court dismissed Count VI for failure to state a claim under the federal securities laws and Count V, common law fraud, for lack of complete diversity between Windon, P.M.M., and Mr. Snipes. The court then gave Windon 10 days to amend the complaint. In the amended complaint, Windon realleged the violations of federal securities laws in conformity with the court's order. Windon again invoked the court's pendent jurisdiction by reincorporating Count V for common law fraud into the amended complaint
 
 
 [6]
 Even in the Court's recent decisions, unanimity was absent. In Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), Justices Brennan and Rehnquist and the Chief Justice dissented from the majority opinion. Justices Brennan, Stevens, Blackmun and the Chief Justice dissented in Celotex Corp. v. Catrett, --- U.S. ----, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)
 
 
 [7]
 The Court looked to the language of Rule 56(c) referring to affidavits "if any " and sections (a) and (b) of Rule 56 indicating that claimants and defendants may move for summary judgment "with or without supporting affidavits " to support its discussion of the movant's burden. However, conclusory assertions to aver the absence of evidence remain insufficient to meet this burden. Otherwise, as Justice Brennan cautioned, summary judgment "[would] be converted into a tool for harassment." Celotex, 106 S.Ct. at 2554 (Brennan, J. dissenting)
 
 
 [8]
 Windon does state almost in passing that C.R.I. referred Mr. Olson to Mr. Snipes. Absent other facts in the record, the law cannot engraft the alleged relationship between Mr. Snipes and C.R.I. onto the brief telephone encounter between Mr. Snipes and Mr. Olson